Pages 1 - 11

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE


DR. SHAUN L.W. SAMUELS,         )
                                )
            Plaintiff,          )
                                )
    v.                          )   NO. 3:13-CV-02261-EMC
                                )
TRIVASCULAR, INC.,              )
                                )
            Defendant.          )
----------------------------- )
and related cross-action.       )   San Francisco, California
_____)   Tuesday, March 10, 2015

      **TRANSCRIPT OF OFFICIAL ELECTRONIC SOUND RECORDING
                      OF PROCEEDINGS**

        FTR 10:36 a.m. - 10:49 a.m. =  13 minutes

**APPEARANCES**:

For Plaintiff:          Berg Feldman Johnson Bell, LLP
                        4203 Monstrose Blvd., Suite 150
                        Houston, Texas  77006
                   BY:  **ARTHUR S. FELDMAN, ESQ.**

                        Mason & Petruzzi
                        4900 Woodway Drive, Suite 745
                        Houston, Texas  77056
                   BY:  **JAMES D. PETRUZZI, ESQ.**

For Defendant:          Kirkland & Ellis, LLP
                        3330 Hillview Avenue
                        Palo Alto, California  94304
                   BY:  **MARC H. COHEN, ESQ.**
                        **LIEN K. DANG, ESQ.**


Transcribed by:          Leo T. Mankiewicz, Transcriber
                         leomank@gmail.com
                         (415) 722-7045

Tuesday, March 10, 2015

10:36 a.m.

P R O C E E D I N G S

THE CLERK:  Calling case C13-2261, Samuels versus TriVascular.  Counsel, please come to the podium and state your name, and also state your name before you speak.

MR. FELDMAN:  Arthur Feldman for the plaintiff, your Honor.

THE COURT:  All right, good morning, Mr. Feldman.

MR. FELDMAN:  My colleague, Jim Petruzzi.

MR. COHEN:  Good morning, your Honor.  Marc Cohen on behalf of TriVascular.  With me is my partner.

MS. DANG:  Lien Dang, also on behalf of TriVascular.

THE COURT:  All right.  Good morning, everyone.  I'm sort of curious.  I mean, it's sort of remarkable up front how there's a -- seems to be an issue that's front and center here about the existence of a valve, or not, that seems to be one of the obvious questions that could be determinative of infringement here.

Is this -- maybe someone can briefly explain to me what the dispute is, and are there disputed issues of fact on this question?

MR. COHEN:  Well, maybe I could start, if it's okay.  Yeah, in -- as you note, we pointed it out early on, even before the lawsuit.  Our device has a hollow tube, which is the

curable polymer.  There is no valve in that hollow tube.

Is that --

**THE COURT:**  How does that work?  I'm not sure I understand how this curable polymer -- does it expand or something?  What is it?

**MR. COHEN:**  It actually is in a liquid state as it's injected, and it fills up the rings of the device when it's in the human body, and then the curable polymer solidifies; it cures at a certain point.  There's a 20-minute version and a 14-minute version.  At that 20 minutes or the 14 minutes, the doctors are instructed, after that curable polymer has solidified, you can now detach the catheters, not detach that fill tube, so there's no need for a valve to prevent deflation.

And so we've provided detailed documentation on this, including the device, even so much as to offer up our Chief Technology Officer, the inventor of the device, for a deposition yesterday, a 30(b)(6) deposition, and what I think I heard yesterday is they're going to argue that a tube, a hollow tube that we have, without a valve, is the same thing as a valve.

**THE COURT:**  And the function of the valve is to prevent what?

**MR. FELDMAN:**  Backload.

**THE COURT:**  Backload.

**MR. FELDMAN:**  Discharge of the polymer into the

bloodstream in the event of a de-mating of the catheter that injects the polymer into the stent graft.  So it's an adverse event that is to be discouraged.  It's --

THE COURT:  A one-time thing.

MR. FELDMAN:  Correct.

THE COURT:  And this valve has its function operate in a static mode after the catheter is withdrawn?

MR. FELDMAN:  Right, and --

MR. COHEN:  Not according to the patent.

MR. FELDMAN:  And if you review the patent, there's a -- one of the contemplated applications was with a hardening polymer.  So yes, it can either be static or it can be permanent.  So the idea is that if there's a valve or a valve equivalent, which is the design that, in combination with the viscosity of the fluid that is being used, is set up in such a way that you either -- your Honor, I do -- may I approach? Because I have a blue tube, so you understand what we're saying, what we're talking about.

It's a pliable blue tube, and you can touch it.  You can open it and touch it.  It's a -- it's made with a material called PTFE, which we learned yesterday there are various versions of PTFE, but you can squeeze it shut really pretty easily.  And so in combination with the back pressure of (inaudible) viscosity of the fluid, which changes over time, it can function, and does, in fact, function as a valve or valve

equivalent.  It won't let anything out, but with pressure, you can put things in and out.  And so it's essentially, because of its configuration, a valve.

We are bench testing a sample.  You have to also understand, these are not -- you can't go to the shelf and buy the device.  It's a $17,000 device.  You can only order it if you're a physician and it's intended for a patient.  You can look at it on fluoroscopy, but it comes in a package that you can't see anything.  It's actually -- there's no way to actually dissect it.

**THE COURT:**  But what I'm looking at is which -- tell me, maybe I've got it wrong.

**MR. FELDMAN:**  That's the injection fill tube port of the device that is affixed to the stent, which has --

**THE COURT:**  Of the accused device.

**MR. COHEN:**  It's accused.  It's the hollow tube.

**MR. FELDMAN:**  Right.

**MR. COHEN:**  It does it not have a valve in it.

**MR. FELDMAN:**  Which is affixed to the graft, which -- in any event, that's the argument.  We're bench testing it soon, and we've agreed to move our proposal till about 15 days after that bench test, and that's where we are.  So we've actually come to agreement on the schedule.

**THE COURT:**  So the question is boiled down, then, to construction of the -- is the term "valve" actually used?

**MR. FELDMAN:**  Yeah, and so --

**THE COURT:**  Claims limitation?

**MR. FELDMAN:**  -- for instance, the literature and the science recognizes a pinch valve, it recognizes a duckbill valve, and any combination of those would be infringing under the patent.

**MR. COHEN:**  And of course, our position will be a hollow tube without a valve, without something that opens and closes, cannot be a valve.  That's just one of the noninfringement defenses that, if we get to the stage of claim construction, that it likely would be a term that your Honor would be --

**THE COURT:**  That is true, because once this is closed, once the polymer's cured, it can't be opened again?

**MR. COHEN:**  Not -- no.  It's now a solid.  There is no -- the fill tube is now withdrawn, breaks away, and the -- that little blue tube and the whole aortic body stays in the patient.  It is now your new conduit for your aorta.  So now the blood flows through that, the new device.

But as Mr. Feldman just said, right before the CMC, we did agree to allow them to delay their infringement contentions to April 15th, so we reached an agreement there to sort of split the difference of the two proposed schedules, and we can either --

**THE COURT:**  That changed everything else?  Because

everything else is sort of commensurate.  I noticed there was --

MR. COHEN:  Then we can either resubmit a proposed order for you based on that or adopt whatever deadlines your Honor prefers.

THE COURT:  Well, if you split the difference, that's fine.  I don't have a problem with that.  On the other hand, let's see.  Betty....

Scheduling a claims construction may moot out your differences anyway, because I've got to figure out a time when we can do this.

Betty, do you have a date of...?

THE CLERK:  (Inaudible.)

THE COURT:  Or before.  We're in trial, aren't we?

THE CLERK:  (Inaudible.)

THE COURT:  So two weeks would be around the 26th or something?  End of October?

THE CLERK:  (Inaudible.)

THE COURT:  Now, one question is whether or not we're going to need a tutorial, and I don't know how complicated -- technically complicated this is, whether it's necessitated here.  If so, then I need to build in an extra week or something to get that in.

MR. COHEN:  I think we should be able to do the tutorial along with the briefing -- in a matter like this, we

actually --

THE COURT:  Something you can visualize.  This is not --

MR. COHEN:  Yeah, we've actually already provided animations of our device.

THE COURT:  Okay.

MR. COHEN:  That would actually help you a lot, I think, in understanding at least our device, and in terms of the patent, it's a pretty short patent; we could submit some slides representative of the patent, as well.

MR. FELDMAN:  (Audio drop) -- absolutely curious, the videos are available online on their website.

THE COURT:  All right, that will save everybody some extra time.  Let's not plan on a tutorial.  If, for some reason, I find myself lost, I'll --

MR. COHEN:  Thank you.

THE COURT:  But let's go ahead and schedule this for the 26th at 2:30.  Do you anticipate this taking more than the afternoon?  You think you'll utilize all 10 allotted --

MR. COHEN:  Well, it's sort of hard to see, because we haven't seen their infringement contentions, and that's usually what are used to determine the number of terms.

THE COURT:  All right.  Well, if we have to go over, then we would go over to -- when?

THE CLERK:  (Inaudible.)

**THE COURT:** All right, let's reserve both days just in case, starting at 2:30, and if you could resubmit the proposed order with these new sort of compromise dates, I'd appreciate it, and I'm just going to schedule up through claim construction hearing. At that point, once we get through that, that's when I'll set a trial date, if necessary.

So let me ask, in terms of ADR, you've got -- it's on here -- I thought you had an ADR plan. Where is it?

**MR. COHEN:** We were discussing former judge, er -- Judge Ware, or Judge Tevrizian --

**THE COURT:** Okay.

**MR. COHEN:** -- from JAMS.

**THE COURT:** Okay.

**MR. COHEN:** We need to contact them and get that scheduled.

**THE COURT:** And you think you can get that done by May -- you have a presumptive date of May 26, right?

**MR. COHEN:** I would hope so.

**MR. FELDMAN:** We can certainly get it done if there's scheduling problems before the 26th of October.

**THE COURT:** All right. Right, I would like to be able to see if you could see your way clear before we delve deep into claim construction, but -- so that should give plenty of time, if you can do it by May.

And do we have an order, that's already established by

order?  It does say we entered an order based on the stipulation of presumptive deadline of May 26.

MR. COHEN:  Yes, we do.

THE COURT:  That's in the books at this point.  So I don't have to do any further referral on that.

Okay, anything else for me to cover?

MR. COHEN:  I think that's it, your Honor.

THE COURT:  All right.

MR. COHEN:  Thank you.

MR. FELDMAN:  Thank you.

THE COURT:  I mean, I don't think so.  I don't think we need another further CMC before claim construction, unless you see some reason to...

MR. COHEN:  That's really up to you.  I have found additional status conferences can be helpful from time to time, but I'm not sure how your Honor handles that.

THE COURT:  Well, I do it by need.  If there's something that needs to be discussed before our reconvening in October, which is some seven months away, I usually build that up as a status conference.

MR. COHEN:  Okay.

THE COURT:  And in terms of discovery, I don't think -- I mean, that's proceeding, right?  I don't need to enter any order in that regard.

All right...

MR. COHEN:  (Inaudible.)

THE COURT:  Great, hope so.  Okay.

THE CLERK:  (Inaudible.)

MR. COHEN:  E-file, yes.  We will do that.  Thank you, your Honor.

MR. FELDMAN:  Thank you very much.

THE COURT:  Good luck in mediation.

MR. FELDMAN:  Thank you.  May we be excused?  Thank you.

                                                    10:49 a.m.

                              ---o0o---

**CERTIFICATE OF TRANSCRIBER**

I, Leo Mankiewicz, certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

_____  04/12/2015

Signature of Transcriber          Date