**Pages 1 - 72**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

SHAUN L.W. SAMUELS,              )
                                 )
        Plaintiff,               )
                                 )
  VS.                            )      NO. C 13-02261 EMC
                                 )
TRIVASCULAR CORPORATION,         )
                                 )
        Defendant.               )
                                 )

                        San Francisco, California
                        Tuesday, November 3, 2015

                **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
                        THE PETRUZZI LAW FIRM
                        4900 Woodway, Ste. 745
                        Houston, TX 77056
                   BY:  **JAMES D. PETRUZZI**
                        **ATTORNEY AT LAW**

                        DIEDERIKS & WHITELAW, PC
                        13885 Hedgewood Drive, Ste. 317
                        Woodbridge, VA 22193
                   BY:  **EVERETT G. DIEDERIKS, JR.**
                        **ATTORNEY AT LAW**

For Defendant:
                        KIRKLAND & ELLIS
                        3330 Hillview Avenue
                        Palo Alto, CA 94304
                   BY:  **MARC COHEN**
                        **LIEN K. DANG**
                        **NATALIE FLECHSIG**
                        **ATTORNEYS AT LAW**

Reported By:       Rhonda L. Aquilina, CSR #9956, RMR, CRR
                   Official Court Reporter

**Tuesday - November 3, 2015**                              **10:08 a.m.**

                              **P R O C E E D I N G S**

                                    ---oOo---

          **THE CLERK:**  Calling case C-13-2261, Samuels versus TriVascular Corporation.

     Counsel, please come to the podium and state your name for the record.

          **MR. COHEN:**  Good morning, Your Honor.  Marc Cohen on behalf of the defendants.  With me is Lien Dang and Natalie Flechsig.

          **THE COURT:**  Great.  Thank you.  Good morning.

          **MR. PETRUZZI:**  Good morning, Your Honor.  Jim Petruzzi on behalf of the plaintiff, and with me is Everett Diederiks from D.C.

          **THE COURT:**  Good morning, Mr. Petruzzi.

     All right.  Well, I have your materials, and you tell me whether you have any preference as to how we proceed this morning.

          **MR. PETRUZZI:**  Well, if I may, I was intending to put on a very short video that I think will give us kind of the setting of how these devices are used.  It's a non-controversial video because it is in fact a TriVascular video.  It's about four minutes.

          **THE COURT:**  Okay.

          **MR. PETRUZZI:**  And then I have a very short ten-second

other little mini video, and then I have my presentation, which I think in this case, because of the way they've interrelated various elements that are not really in the same part of the claim, that I was intending just to go through the entire ten terms.

I'll be happy to do it another way, but that's kind of --

THE COURT:  Well, maybe I'll give you some guidance once we look at the video.  But I think there's some specific issues I want to talk about rather than sort of starting from scratch, so we'll do it that way.

MR. PETRUZZI:  Well, what I have is a video that's, like I said, it's a TriVascular video.

MR. COHEN:  So that's the video that's on the web site?

MR. PETRUZZI:  It is one of those videos that you produced.  It's the same -- basically the same video with some more information on the front end.  And then I have a more generic tutorial more specific to the patent itself before we get to the claim terms, and I could do that.

THE COURT:  Let's do that.

MR. COHEN:  Thank you, Your Honor.

THE COURT:  Good.

MR. PETRUZZI:  And just so everyone knows, this first video was produced by TriVascular in litigation.  It's about four minutes.  It shows one embodiment in effect of this kind

of device.  We don't, obviously, sponsor everything said in the video, but for purposes of understanding how this works and where it's fit in the body in this one kind of embodiment, it's very helpful.

There is one little section at the beginning which is sort of gory which shows an open heart or open procedure; it's only a few seconds, but I just want to point it to everyone, and we'll just see how it goes.

(Video played.)

**MR. PETRUZZI:**  You could see from the video for that particular malady, this triple A procedure, this is how a typical stent like that would be inserted.  It would be inflated and remain in place.

Now, in another environment, which is also shown in the patent, which we have here, is very short, and is a situation where there's occlusion of the vessel, and you can see it's just insertion of the device.  There's inflation, and it remains in place by sealing those rings pushing into the inner diameter of the vessel.

And, you know, this video, you know, the defendants actually brought to your attention in their brief the video, and the case law that says what the defendant does is helpful on claim construction, and in some cases I take that as true. And if you look on the video, the device of the invention in this patent was the upper portion of that y-shaped device, so

that's really what's at focus here.

**THE COURT:**  Right.

**MR. PETRUZZI:**  The Y is to then feed blood flow to where it is, in effect.

So the basic invention is really shown quite clearly we think here in figure 1 in all the material aspects of it that are important.  You have the inflation means, which is the syringe and the tube, and you have the inflatable cuff, which is this cylindrical device, and it's inflated by filling those, in this case, four inflatable ridges.

And there really is no question that the patentable aspect of this invention was the inflatable ridges, that's what we went through the IPR, the *inter partes* procedure.  That was the issue of the day, and that's what we prevailed on on validity.

And the same is true during the prosecution of the patent.  It wasn't about the valve, it's not about the syringe, these are all common things in the prior art.  And it's interesting how much time is being spent on the valve when the defendants have said that they don't have a valve, and yet we're spending half the briefs on that.

But in any event, it's a very simple device, and the claim terms flow directly from the plain meaning of the different terms.

I just want to walk through not so much the claim terms, but how this device works similar to that video.

So here we're showing a basic aneurysm in this case, and the inflatable device in an uninflated state.  The blue tube is the inflation tubing that goes into a port -- and this is based on the patent -- so you insert the device where you want to locate it, and you begin inflation.  You continue with inflation, and then when you're satisfied that it's inflated to the degree necessary, you're at a fully inflated state.  And these devices are sized based on the aortic diameter, so even in the TriVascular instructions for use, they talk about oversizing the stent so that it's bigger than the inner diameter of the aorta, because it's important to really push it into the walls, so that's how this device generally is being done.

Now, in the patent itself, it shows a variety of valves, and this is a depiction of all of the different valve embodiments that are shown; and you can see right here (indicating) is the so-called breakaway seal valve, and then up above it are these optional leaflets.  And I'll show you in a minute why they can be optional, because, as the patent teaches, the inflation material is, you know, is blown in basically to inflate the device.  And once it's fully inflated, there's inflation material all in there.  It's a liquid.  And whether you have those leaflets or not, this thing would inflate, it would allow it to inflate, and it would stay inflated because of that seal.  It prevents inflation, and

that's exactly what the inventor describes in the patent.

THE COURT:  The seal caused by the breakaway valve or the seal caused by the flaps, leaflets?

MR. PETRUZZI:  It describes that when the material that hardens, the breakaway valve is what is there to prevent deflation, in effect, because the leaflets don't even come into play.  You could remove those leaflets and still inflate this device.  You would use the breakaway valve that he describes, and it would harden, and you would then yank it out.  And all that yellow fluid there, except for the piece of it that's inside the tubing itself, will stay there in a hardened state, as the video described as sort of like a pencil eraser.

So whether you have those leaflets or not, that first valve that he describes permits it to inflate.  Because if you didn't have it, if you just had a tube sitting in there, the material would flow right back out just by virtue of the, you know, hydrodynamics.  There would be nothing to stop the fluid, and that's what acts as the valve during an inflation.  And then when you yank it out, it's a hardened material, and that's the end of that.  It's already prevented deflation at that point during the process of inflation.

THE COURT:  What's the speed by which the fluid hardens?

MR. PETRUZZI:  Well, in terms of the TriVascular device, they have two different modalities, I think it was 14

and 20 minutes.  The patent just describes generally that there are hardening agents that can be used.  And the way the procedure works is after you got the device where you want it and you've inflated it, you wait a certain period of time until the material hardens, and then you yank this tubing out, and you leave the device in.

THE COURT:  So what function would the leaflets perform, if any?

MR. PETRUZZI:  Well, remember, again, the leaflets -- these are different embodiments in the invention.  The invention doesn't require that you have leaflets.

THE COURT:  Right.  But in this particular embodiment, what function do they perform?

MR. PETRUZZI:  Well, if you have this embodiment, they wouldn't perform any function, they were just there.  If the fluid was totally liquid and you wanted to do an environment where you put saline and you pull the tubing out, then in that case if you had the leaflets, the leaflets would collapse, and that would then act as the mechanism to stop it from leaving.

THE COURT:  So it really depends on the nature of the fluid that's used.  If it's a hardening fluid, you don't need the leaflets, is your position.  If it's something that remains -- that doesn't harden, then you need the leaflets to prevent the backflow.

MR. PETRUZZI:  Well, the inventor has described a

variety of different embodiments:  One that has the seal valve, one that has the leaflets, and one that has -- and I'll get to that in a minute -- has a combination of the two.  So for purposes of the disclosure, the inventor clearly has discussed all these different ways of doing it.  And as we pointed out in the prior art, it was well understood that you could have just the breakaway valve and not the leaflets.  And when using a hardening agent, which is disclosed in the patent and claimed in fact, you end up with a perfectly workable device.

So the -- when we get into the patent drawings, you'll see that he points out very specifically the breakaway valve, the mitre valve, or duck bill valve, and then he talks about a combination of the two.  And these are exemplary disclosures in the specification that are used to understand the broad contours of the invention, but are not to be limiting on the terms themselves when we get to it, for a variety of reasons that we can discuss.

But it's very clear that this inventor contemplates specifically this kind of circumference seal-type breakaway valve as the valve that would be used in one way of using the device where you had a hardening material and the leaflets would never come into play, because they would, in essence, in this case, if you even had them, they would remain locked in position by the hardening fluid.  It's sort of a -- there's an issue of how strong that polymer is once you get to a point of,

in their case, 14 to 20 minutes.  It's strong enough to stay, but you can yank on the tube and it breaks off very cleanly, and that's how they break away the tubing.  That's how the invention describes the breakaway.

THE COURT:  So this is one of the major questions, right, that we're here to resolve, whether or not the patent -- whether or not the mitre valve or the duck bill valve would move both leaflets is an essential part of the invention.

MR. PETRUZZI:  Well, our view it's a question of what proper claim construction of the term "valve" is to one who is skilled in the art.

THE COURT:  Right.  And you're taking the position it does not require movable leaflets or movable parts, that a breakaway valve alone is sufficient.

MR. PETRUZZI:  Yes.

THE COURT:  And you -- okay.  Well, let me do it this way.  Now that you've heard this --

MR. COHEN:  I will definitely address that in our presentation.

THE COURT:  Well, I'd like to just take one at a time, but I'd like to focus in on this issue.  This seems to be a major issue, so let's get it all out right now.

MR. COHEN:  Right.  I'm happy to do that whenever you're ready.

THE COURT:  I'm ready right now.

**MR. COHEN:** Do you mind switching over?

**THE CLERK:** Sure.

**MR. COHEN:** I'll just skip over our tutorial briefly and jump right into the valve language.

This is the valve permitting entry of the inflation material and thereafter sealing said cuff to prevent deflation. What I've put up is slide 41. That language is in all three independent claims.

In slide 42 we put the competing constructions. And you're right, Your Honor, that we assert that the intrinsic evidence informed this valve for permitting entry of inflation material and thereafter sealing as a movable part such as leaflets that open and closes. I'll take those one at a time.

We also have a negative limitation about how they distinguish the Holman patent. We'll talk about that separately.

So first, the real issue is, as you asked, should the term be construed to include a movable part that opens and closes to seal a cuff to prevent deflation. So what we have to do is go through, starting with the claim language, and go through the intrinsic record to see what evidence we have. And starting with the plain language we see that there's two states called for by this valve term. It's not just any valve, but it's a valve for permitting inflation material, which is opening, and thereafter sealing, which is closing, so at least two states.

Now, it's going to go to the specification.  What does the specification tell us?  It tells us that the inflation tubing causes the leaflets to open to permit the inflation material in the cuff or allow it to be deflated.  And now I'm on slide 45.  And what we've tried to do on every one of our slides, when we're actually referring or quoting from evidence, we've actually got the citation to the evidence on each one of our slides.  And as column four shows us, figure 8, when inflation tubing 61 is engaged, configuration valve 37 mating end of that inflation tube separates, that is opens, opposing leaflets 51 and 53 so that the cuff may be inflated.

Now, let's talk about the second state, and that is the intrinsic evidence showing us the movable part that closes, to seal, to prevent deflation.  Again, column four talks about upon withdrawal of the mating end 63 of the inflation tubing 61, as shown in -- it says shown in figure 3B, but that's a typo in the patent, there isn't a 3B it's actually 4B -- opposing leaflets 51 and 53 of the mitre valve 45 close to seal the inflated cuff.  So this is language from the patent talking about the inflation tubing opening, separating the leaflets, and then withdrawing the inflation tubing to close.

THE COURT:  From the specification.

MR. COHEN:  From the specification; correct.  And maybe we should -- let me ask -- there's one comment that I thought you were asking about, which talks about the inflation

material, so let me ask for slide 15.  Slide 15, please.

So slide 15 -- actually, I just wanted to point out that this patent is actually directed to the inflation material that has -- and this is in the bottom of the slide -- '575 patent, column four, line 34 to 37:  The inflation material could be a saline-based fluid or a material that contains a photo activated or heat activated hardening agent, or any hardening agent that hardens over time.

So just so that we're clear, we've heard a lot about a hardening material only, but this patent isn't directed to just a hardening only embodiment, it's directed to both saline and hardening.

We also heard from plaintiff's counsel saying that it's claimed that way.  Well, not exactly.  It's only claimed in the dependent claim, Claim 7.  It's not in any of these independent claims that we're talking about here.  So presumably what we're talking about here is this claim device is covering both a saline-based version or a hardening-based version, and importantly it hardens over time.

So could we go to slide 47, please?

All right.  So we talked a little bit about what the specification teaches or discloses.  Let's look at how that specification shows us using figures.  Again, once that inflation tubing opens the leaflets 51 and 53, it allows for that inflation, and the patent talks about withdrawing that

inflation tubing to close or to seal that cuff.

And, again, we have annotated these figures, but these are figures from the patent.  It's important, because I think we'll get to it in a little bit, but the figures that you've already been shown are not quite accurate, the figures that have been shown by the plaintiff are not quite accurate.  In fact, why don't I jump right to that, because this is a good place to show you.  Figure A there, 4A, when you see that inflation tubing has opened up the leaflets, right at that point that material isn't flowing back out, right, because the inflation tubing has opened.  That's for inflated.  But there is no material that's coming back out, because the tube is in place, and those leaflets are preventing it -- in the green area there the leaflets are preventing any material from going back.

But the patent talks about sealing.  When the patent talks about sealing, it's talking about withdrawing that inflation tube so that the leaflets close.  And I'll be specific when I say that, because I'm going to go to slide -- let me go to slide 52, please.

Every disclosure in this patent of a valve to seal the cuff shows withdrawing the inflation tubing so the leaflets will close.  Now, I put up slide 52, which shows you three sections of the patent that talk about this sealing inflated cuff.  And, again, it's upon withdrawal of the mating of the inflation tubing, the leaflets close to seal the inflated cuff,

and later on in column five, once the catheter is removed, the stent may be sealed.  Again, it's sealed because those leaflets close.  And then we go to column six, and this is an example of the patent.  Same thing.  Once the catheter is pulled away, the valve, mitre valve seals, and as a result the inflation material can't escape.

We now go to 48.  And so that we're clear, if that movable part doesn't exist, if those leaflets aren't there, that material in red in 4B, that's going to flow up.  Because when you withdraw that tube, and the patent talks about withdrawing the tube, you want to seal it.  If you don't have those leaflets, it's going to flow out.  And there is no embodiment in this patent that says you can do this without leaflets. There's nothing in the patents that says you can do this without the leaflets, according to this patent.

**THE COURT:**  Well, except there's reference to hardening agents.  For the hardening, heat activated or photo activated hardening agent, that implicitly would not require the leaflets, because if it hardens, it hardens.

**MR. COHEN:**  No, not this patent.  The hardening material hardens over time, so what happens here is you inflate it -- and we're just sticking with the hardening material -- you inflate it, the hardening material, you then, as the patent talks about, you withdraw to seal the hardening material, so then the hardening material hardens over time.  There is no

disclosure in this patent, there is nothing in this patent about leaving the hardening material in place and not withdrawing at some point. There's nothing in the patent about that. It's only talking about withdrawing the tube to allow it to seal. And so the only consistent application of both the saline-based and hardening is what the patent talks about. You withdraw that tubing so that the leaflets close in both the saline solution and in the hardening solution.

**THE COURT:** Well, it says hardened over time, so you're construing over time for a long time, longer than it takes, 14 minutes or whatever, to harden to allow you to pull the inflation tubing out, and you're talking about something that occurs over -- I don't know if that's obvious or not.

**MR. COHEN:** Well, what I'm talking about is what's disclosed in the patent. There is nothing disclosed where you leave it connected and you just let it harden with the leaflets in an open position. That's what counsel has stated, but there's nothing in the patent that says that, and, in fact, that is not consistent with what we're trying to interpret here. It's the valve for thereafter sealing to prevent deflation. If you just have that hardening material sitting in there, there's no sealing to prevent deflation. So what we're trying to construe here is a specific valve for sealing to prevent deflation, and every time we see in the patent about sealing to prevent deflation, we're talking about withdrawing

that tubing and the leaflets closing.

**THE COURT:** What about the rule that we don't import limitations from specifications?

**MR. COHEN:** Absolutely should not be --

**THE COURT:** Isn't that an argument that that's what you're doing here? You're looking at the specs and saying well, every time they mention it, they're talking about opposing leaflets and the mitre valve, and therefore that's what we're talking about.

**MR. COHEN:** We are not -- and I'm sorry if I wasn't clear. We are not importing limitations. We are simply -- we're taking that claim language "valve for sealing to prevent deflation," and we're trying to look at the intrinsic evidence and say what does that mean? Does that mean it has a part that opens and closes? According to this patent, yes.

**THE COURT:** So your argument -- let me make sure I understand. First, there's a language of Claim 1C itself where it says, "and thereafter sealing said cuff," and therefore that suggests that it's the valve that seals, not just -- it doesn't say permit sealing, it just says sealing. That's argument number one.

**MR. COHEN:** That's correct.

**THE COURT:** Number two, every embodiment that's described in the specification, every description of it contains a movable part, i.e., these leaflets and duck bill or

mitre valve situation.

Number three, the specification itself allows for either the inflation material to be either saline-based, which is non-hardening presumably, or material that contains a hardening agent.  And even if you construe the "over time" loosely to mean something in 14 minutes, you have a saline-based -- if you use a saline-based fluid, which is one of the alternatives that's called out here, you have to have some kind of valve, because that's going to leak right out.

**MR. COHEN:**  In fact, I think plaintiff's counsel agree with you on that with the saline.

**THE COURT:**  So what's important, arguably, is the word "or," account for line 36 in the schema specification, because it says saline-based fluid *or* material that contains a hardening agent.  That means it could be either, and you can't have the former without some kind of a valve.

**MR. COHEN:**  That's correct.  I agree with you, although we also believe that in the hardening embodiment, you still -- when you have a valve for sealing, you're withdrawing that tubing, according to the patent, so you seal that material in there, so it hardens over time.

**THE COURT:**  And is there further argument that dependent Claim 8 because it calls out the mitre valve that suggests that the independent claim does not necessarily incorporate that?

**MR. COHEN:**  Correct, we are not asserting, Your Honor, that Claim 1 requires a mitre valve, we're simply saying it has to have a movable part that opens and closes.  The leaflets was just sort of an example, and we are not limiting it to a mitre valve.

If we could go to slide 49.

And so it's not just this disclosure, but if you look at the file history, when Dr. Samuels was describing what is it, what valve are we talking about that permits entry and then finally seals the cuff?  In two different places when he's describing his invention, and this is on slide 49 with the cites to our exhibits, he makes these specific statements that require the valve with the leaflets, not the breakaway valve.  And I haven't talked about breakaway valve, and I need to, the valve that permits entry and thereafter seals.  We've cited this in our opposition brief, and there was no response in plaintiff's reply brief.

So if we go to slide 50.

So not only do we have these file history statements, which are unequivocal, but the intrinsic evidence shows that -- I'm sorry -- all of the intrinsic evidence shows that a valve for permitting entry of the inflation material and thereafter sealing is a device that has a movable part that opens for permitting entry and closes.

Now, let me talk about that breakaway valve, because

that's the next slide 51.  So there's no intrinsic evidence to support a breakaway valve 43 as the claim valve for sealing to prevent deflation.  And so what we have here is, in the specification, the three different areas where it actually talks about the breakaway valve 43, and explains what this breakaway valve is; it's used to secure the inflation tubing, and then releases the tubing with a sharp tug.  So it has that little notch and rim, and once that inflation tubing is engaged in that port, it secures it and then releases it with a sharp tug.  Whereas the mitre valve actually seals, and that's -- they just actually have that right in the language in that third quote there.

So it's important, because the claim that we're construing here is not a valve to secure inflation tubing and thereafter releasing the tube.  We'd be in a different situation.  If that were the case, we'd be pointing to valve 43, but we're talking about a valve for permitting entry and thereafter sealing.

So there is -- just so we're clear, there is nothing in the specification about this breakaway valve 43 doing a sealing.  And what we've heard, and you'll see slides from the plaintiff that said -- they call it a -- they call it a breakaway seal valve.  There is nothing in the patent that calls 43 a seal valve.  You won't see any cite in their papers or on their slides to breakaway seal valve.  So I hear it, I see it in their slides, I see it in their brief, but there's

never a cite to any of the intrinsic record, because all the intrinsic record here shows, when we're talking about sealing, we're talking about a movable part that closes.

Now, go to slide 52, please.

So I went through this -- I'm just going to go through this again, because this relates to the breakaway valve issue. Every disclosure of a valve to seal shows this withdrawing inflation tubing so the leaflets close. I'm on slide 52 with the evidence cited on the slide. There is no disclosure of a breakaway valve for sealing a cuff to prevent deflation.

Now, we also submitted intrinsic evidence in the form of patents that were cited during the prosecution of this, and not surprisingly, it has the same type of structure, it's the movable parts that open and close.

In this Pigott patent, there are these lips which are sealed, and you insert a device which opens those lips, figures 4 and 5, from the Pigott patent, as we've annotated here on slide 54, show that lips 35 of valve 32 are closed, and then the lips are opened with an insertion tube.

THE COURT:  Well, what's the relevance of the Pigott patent here?

MR. COHEN:  Well, it's simply that it's further evidence that when we're talking about a valve for sealing to prevent deflation, we're talking about something that has a movable part that opens and closes.  So we submitted the Pigott

patent, which uses the ordinary meaning of valve for sealing. We've submitted the Block patent, which is a cited reference also. This is a little bit different, because it's a prosthetic cardiovascular valve, but, again, it's open and close configurations. Throughout all of the intrinsic record when we're talking about sealing, we're talking about open and close configurations. That was slide 55. I'll jump ahead.

And so our proposed construction, which comes right from the intrinsic evidence, is a device that has a movable part that opens and closes. And what we found interesting is that the plaintiffs submitted various dictionary definitions. Now, they weren't from the proper time frame, so we put the 1996 definition, because the *Phillips* court has told us, and the federal circuit has told us, if we're going to be using dictionary definitions, you got to use it from the time of the invention. And this patent was filed in June of '97, so you got to be using, if you're going to use extrinsic evidence, you got to use it from that time frame. And sure enough, the dictionary definition of "valve" says:

(reading) Any of numerous mechanical devices by which the flow of liquid, gas or loose material in bulk may be started, stopped, or regulated by a movable part that opens, shuts, or partially obstructs, and it moves on. Also, the movable part of such a device.

So not only the intrinsic record, but also the extrinsic

dictionary definition supports TriVascular's construction of a device that has a movable part that opens and closes.

I think it's also helpful to understand that they distinguished this Holman patent in the IPR. And I'm just going to show you briefly what Holman shows, because it's sort of similar to what they're now trying to say is their valve for sealing. And what you've got there on the left, figure 10b from Holman, is this inflation tube 252 which is inserted into inflation port tubule, miniature tube, 240. It has on there this ring 262, which is a pinch ring which creates an interference fit. So 10B shows when they're apart, 10C shows when you've inserted that inflation tube into that port. And I will show you the paragraph where they distinguish this.

What they said, with this Holman, is there's no need to use a valve. They didn't say, well, this is the claimed valve. This is what they're trying to say now. They're trying to say that this is actually a claim valve. But there's no movable part here. There's no -- nothing to prevent -- nothing for sealing to prevent deflation here.

So let me go back and show you the actual language from the file history. I'm on slide 58, Exhibit 1. This is Samuels' statement distinguishing this Holman patent, and quoted the whole language there, they said:

(reading) Holman employs a chemical or mechanical hardening system. More specifically, a surgical graft is

placed in a human body, and then a material is injected into the surgical graft so that the graft expands and is fixed in place.  The chemical or mechanical hardening system is used to harden the injected material.

In one embodiment a curing polymer is introduced into the graft to harden the injected material.  As such, there is no need to use a valve since the injected material becomes hard when placed in contact with the curing polymer, and therefore there is no apparent reason to use one even in view of Pigott.

So one of ordinary skill in reading that language understands that what Samuels is doing here is distinguishing his claimed valve for sealing, because of course this doesn't have a valve that has a movable part that closes to prevent deflation.  So that also supports, of course, our position.

And on slide 59 I go through in more detail the actual Holman description, but I've taken you through that already.

**THE COURT:**  All right.

**MR. COHEN:**  Of course we know the Court knows the law, so I'm not going belabor slide 61, which is *Vitronics* case. But the intrinsic record is really what controls.  It's not an attorney argument, but we really need to stick to the citation to the record.

At some point in plaintiff's opening brief they said it was improper to look at the functions, but I think they've gone

back on that now, because of course it is entirely proper to consider the function in the claim language in understanding the structure of that valve.

I can respond to some of the other extrinsic evidence that they've raised in their brief or I can wait.

**THE COURT:**  Well, let me hear from Mr. Petruzzi at this point.

And I'd like to you to respond to some of the main points here.  First, the claim language where it says in 1C that they're talking about a (reading) valve integral with inflation for permitting entry, permitting entry of inflation materials and thereafter sealing to prevent deflation.

So it sounds like, if you read this in a normal grammatical sense, the valve has to permit injection or inflation from entering, to enter, and, *and* thereafter seal to prevent deflation.  So it sounds like it's got two functions, in and out, and which accords with the normal, I would think, dictionary, if you can rely on the dictionary.  The valve normally is seen as, you know, open and close or, you know, controlling things, that's what a valve is, and so it simply allows inflation, but it says nothing about deflation.  It seems to me it's a pretty tough call, especially in view of the express language in 1C.

**MR. PETRUZZI:**  There's a couple issues there, Your Honor.  First, what the defendants have really done here is try

to make Claim 1C a means for a type term.  They're using a structural element which is just stated as a "valve," and then trying to interpret because it says, "for permitting and thereafter sealing" to pull in this specific structure that's in the patent itself, which I think is improper.

In the -- like I say, in the patent office they don't even consider this language, which is just functional language.  And the language itself is a valve, and that's borne out by a dependent Claim 9, which says -- or, yeah, 9 where it's a breakaway design, it clearly is not including twin valve.  It's not two-valve.  Claim 1 is one valve.  Claim 9 it says it's a breakaway design.  You would never pull out the so-called movable parts of the mitre leaflets.  So it doesn't make sense that Claim 1 has to include the leaflets in view of Claim 9.

And on just basic document claim differentiation and how you would interpret it, this valve that we've shown, this very valve the inventor described in great detail as the circumferential seal or this circumferential valve fitting, does permit it to inflate, because if you don't have it, it will not inflate.

**THE COURT:**  But it doesn't permit it.  It doesn't prevent deflation, and every time it's mentioned there's also every --

**MR. PETRUZZI:**  But it does.

**THE COURT:**  -- every paragraph it mentions the

leaflets or the mitre valve.

**MR. PETRUZZI:**  But it does prevent deflation, because if you don't have it there, the thing would deflate.  Now, once the material hardens, you don't need either of the valves.  It doesn't say thereafter to prevent deflation for all time.  The way these devices are worked, and the way one of ordinary skill in the art who understands these inventions, and when they read there's a hardening agent, knows that the device is placed, it's inflated, they wait, and then they pull out the inflation tubing, and the device stays in place.

The TriVascular device has, you know, a seal just like this.  They inflate, they let it hold, and it gets hard, and then they pull it out.  That valve that this inventor described as a valve -- it's not like he didn't.  He referred to three valves in this patent:  The breakaway valve, the mitre valve, and then some combination of the two.  So he clearly contemplated when he said a valve, it could include just the breakaway, because Claim 9 says where it's a breakaway design, and so you wouldn't pull away a mitre valve if you had it inside that tubing.  It would rip the thing apart.

I'd like to address --

**THE COURT:**  What about Claim 8?  If you're going to make that argument, what about the existence of dependent Claim 8 which claims a mitre valve?

**MR. PETRUZZI:**  Well, in Claim 8 it could add -- it

could be a mitre valve.  It would be an additional element to the valve that's broadly claimed in Claim 1.

I mean, there's no support in the patent for this notion of having movable parts or non-movable parts, in this case a movable parts valve.  They're just using that to try to fit the solid dictionary definitions.

THE COURT:  Well, except the description makes repeated reference to opposing leaflets and the mitre valve.

MR. PETRUZZI:  Well, true, yes, but it doesn't talk about leaflets as such, and leaflets can move.  But there's no -- what I'm saying is to introduce the term "movable part" the way they are, you would not have any definition as to what that means.  It could mean any number of things:  How much movement?  Does it move -- you know, if it's not a mitre valve, then what kind of movable parts valve is it?  Is it an orifice valve?  Is it some kind of septum valve?  There's a lot of different valves out there.

In this patent, the inventor specifically referred to this breakaway valve.  And if we go to our presentation -- if you would, could we switch over to our screen?

THE CLERK:  Yes.

MR. PETRUZZI:  This slide didn't show in the beginning when I wanted to show it, Your Honor.  In this case, the very valve that's described, which is this indentation (indicating), if you don't have that, not only is the tubing going to just

blow out, but the material would come back out.  You have to have that valve, which he described as a valve.  I understand nobody wants to call it a valve on the TriVascular side, because this is like somehow how things operate.  But the inventor said it's a valve.  He called it a breakaway valve.  And in the medical art that is not uncommon, and this inventor did in fact use it that way.  And more importantly --

THE COURT:  Let me ask you something.

MR. PETRUZZI:  Yes.

THE COURT:  What about the word "thereafter"?  I'm looking again at 1C:  Valve integral -- it's interesting -- permitting entry of the inflation material, and thereafter sealing, not at the same time sealing.  You're talking about if you didn't have a breakaway valve, the stuff would leak out as soon as you'd put it in simultaneously.  This says, "thereafter."  Doesn't that mean something?

MR. PETRUZZI:  Thereafter it's inflated.  I mean, you inflate the device.  It pushes the material to the back end of the device, and then as it backs up, it slowly fills all of the cavities, and at that point it prevents it from deflating, and you let it sit there in a deflated position.  You can pull the syringe back, and you could deflate it a little bit at that moment, I suppose.  But in this case it prevents deflation at the moment you're doing it, and that's very important.

THE COURT:  At the moment, that's exactly what I was

saying.

MR. PETRUZZI:  And during the time the material is hardening.

THE COURT:  Well, but at the moment, this has the word "thereafter" that suggests almost after the injection of the inflation material that you want to prevent it from leaking out, not as you're putting it in.

MR. PETRUZZI:  It does both.

THE COURT:  If you didn't have a breakaway valve and the circumferential ring to seal it while you're filling it up, you know, it's like trying to fill up a basketball with air leaking out at the same time, you get nowhere.

MR. PETRUZZI:  Right.  You can't inflate, so it prevents inflation.

THE COURT:  So it prevents inflation during the inflation.  This doesn't say during, it says, "thereafter."

MR. PETRUZZI:  Well, it does both.  It clearly prevents it after, because while it's sitting there it's blocking the thing from deflating, that's how he describes it.

And the hardening agent -- and, in fact, if you look at the slide, I think it's very important again to understand these claims have to be read first with their ordinary meaning then with respect to what one of ordinary skill in the art would understand them to mean.  And in this case one of ordinary skill in the art, as exemplified by Samuels himself in

his own patent, says you could put the detachable valve in place at the duck bill valve; and he describes that after the material is hardened, you can pull it back and break it away. That's exactly what is going on in this patent.  This is prior art.  It teaches one of ordinary skill that is one way of doing it.  He specifically discusses replacing the duck bill valve with this detachable valve.

And they're not talking about a detachment valve that yanks out the duck bill as well, they're talking about this kind of notch valve that these -- that doctors use that they call valves, and he clearly describes and shows and points out. If you have the drawing, you know Mr. Holman pointed them out as well.  But if you look at figure 4B, item 43, he points to that specifically as the breakaway valve.

There's no question to one reading this patent would understand there are a variety of different valves that can be used.  And Claim 1, which claims one valve, can include that, and Claim 9, which says it could be a breakaway design means that it could be this type of valve, and it does not have a mitre or leaflets.

I don't think it could be any clearer that this inventor in a sense defined "valve" in a variety of ways, and maybe not the traditional way.  But in the medical field these kind of fitting valves are commonly used, and that's why the inventor used it in this patent.

**THE COURT:** What about that part of the specification that says the inflation material could be saline-based or a hardening material?  Now, if it's saline-based, you do need -- you do need leaflets or some kind of backflow preventer; right?

**MR. PETRUZZI:** You could have a backflow preventer, you could have any kind of structure that affects the flow, but it doesn't have to have moving parts.

**THE COURT:** Well, how do you prevent saline from leaking out when there's differential pressure from one side, the inside and the outside, without something that moves?  It allows entry and yet disallows exiting.

**MR. PETRUZZI:** Well, I --

**THE COURT:** Can you think of a valve that doesn't have any moving part?  I mean --

**MR. PETRUZZI:** It could have things like a, like I said, an orifice valve, you could have a series of small apertures.  The pressure on the back side is high enough to get it in, but there's no pressure coming back out.  Once you fill this thing, the only pressure in the system is blood pressure. But to fill it, you might have pressure that's two, three, four times blood pressure to get it in.  So you could clearly have a system where you could inflate the thing with saline under certain pressure, with apertures where there's no pressure pushing things back out.

**THE COURT:** But that aperture has to change from

inflow to outflow or inflation to deflation to some extent, maybe by a very, very little amount, but in comparison with the changes.

MR. PETRUZZI:  Well, I mean, I can't go through all the details of fluid dynamics, but you could have an orifice that's one size that gets smaller and smaller.

THE COURT:  Well, that's what I mean.  If it gets smaller, something is moving.

MR. PETRUZZI:  It's not moving, it's three different orifices, so you have differing size apertures that allows the fluid to go in, but it cannot come back out, because there's no pressure to push it back out through that small aperture, depending on the nature of the fluid and the size of the hole. So there are environments where you could have a non-moving parts valve that would prevent backflow and, like you said, a backfill preventer.

THE COURT:  There's nothing disclosed in this patent other than if you're using a saline-based fluid as called out as one possible inflational material in column four, there's nothing else disclosed in the description here other than using opposing leaflets or mitre valve.  I don't see any other description of aperture valve or anything else.

You know, I understand the caution about importing limitations from the specifications, but this is intrinsic evidence you have to look to.  It's not irrelevant, it's quite

relevant, and--

**MR. PETRUZZI:**  Right.

**THE COURT:**  -- so I don't see any other embodiment.

**MR. PETRUZZI:**  Well, the valve term in this case, because of the way it was written, and with the dependent claims, you know, maybe it's such that it applies in that situation where it's using hardening fluid.  I mean, I'm not sure it has to cover all different potential parts of the disclosure in a manner in which it operates.

**THE COURT:**  Well, dependent Claim 7 specifies a hardening agent, so that's a separate one that would suggest -- that would suggest that, you know, the fluid referred to in Claim 1, the independent claim is not necessarily a hardening agent, so --

**MR. PETRUZZI:**  Well, may not include a hardening agent, but it may be thick enough or viscous enough that it doesn't flow back.  It doesn't have to be saline necessarily. I mean, the saline environment might be only with a device that is used for testing purposes only.  I don't think it would be left in --

**THE COURT:**  Right.  But even if it's something more viscous, but it doesn't harden, you certainly -- if it doesn't harden at all, you certainly wouldn't pull the inflation tube out and expect nothing to happen, if you didn't have some kind of, to put it crudely, backflow preventer.

**MR. PETRUZZI:**  Well, that would depend, I guess, on the nature of the fluid and the viscosity of it.  I can't really speak to that, other than the type of viscosity, if you had a narrow enough passage it would not flow backward.

But in this patent, the valve term is clearly broad enough to encompass the different valves that are included.  And in the dependent claim it says, "wherein the valve is a mitre valve," I think strongly supports the notion that Claim 1 is broader than that.

The idea that Claim 1 is any number of multiple moving parts valves, you know, it just seems to me that you're going into an area of some ambiguity as to what that would even mean. You would have to have another round.  I don't know what that means.  I mean, it's easy when you're looking at a duck bill valve, because it's pushing and opens and closes.  But movable parts, there's a lot of things that move in the system when you insert the tubing, and whatnot, and remove the tubing, that might qualify as a moving part.  And so I think it's safer to go with a broader construction, frankly, that's consistent with the way this term is used in the patent, consistent with dictionary definitions, consistent even with TriVascular's own patent, which talks about literally an orifice being a valve. And just because their patent occurred later -- either a hole is valve or it's not a valve.  It's always been a valve.  Like I said, there's orifice valves in there all the time.  It

wasn't invented by TriVascular when they filed that patent.

Now, on Holman, I want to address that briefly, because they make a lot of noise about Holman.  Holman was one of nine arguments made at the *inter partes* on an obviousness ground, 103.  The defendants cited Holman for a device that did not have a valve.  That's why they cited it, because it had other elements, and then we're arguing that one of ordinary skill would be the obvious to add Pigott.  So they were arguing that Holman doesn't have a valve, Pigott would teach the valve, and you could make the combination.

Our response was that that was not an obvious combination.  That's the context of these arguments.  And the Board didn't take it up.  They didn't consider that to be anything.  So you don't have any claim that was allowed because of the argument.  You don't have an amendment to the claim.  It's not even close to the kind of clear disavowal that they're trying to interpret it to be.  It was an obviousness argument that the Board just didn't take up.  And our argument was a little broader than that, and it was that Holman had a certain kind of circulation system in addition to the hardening agent that would not be obvious to add the Pigott valve to come up with the invention.  Because, again, the defendants were arguing that Holman didn't have a valve.  Now they're trying to argue that maybe it has this fitting, and we think it's a valve.  We never said that Holman did or didn't have a valve.  What we said was Holman

didn't need a valve, and you wouldn't combine it with Pigott which didn't have a valve, and the Board didn't take it up.  So you're talking about an argument made in connection with an invalidity on claim terms that had a different construction than we have here, the broadest reasonable interpretation construction.  It wasn't taken up, and never made it into the *inter partes*, so I don't think it's a very good example of clear disavowal, scope, and the context of what we argued, and we're arguing that it didn't have a valve.

THE COURT:  All right.  Let's go on to some of the other issues.

MR. COHEN:  Your Honor, may I respond to like the claim differentiation point.  There's a couple points --

THE COURT:  Just briefly.

MR. COHEN:  Ms. Lee, could you switch that over, please?

THE CLERK:  Sure.

MR. COHEN:  So jumping right to the claim differentiation point, what I've got on slide 65 is their contention that we're somehow running afoul of claim differentiation because of dependent Claims 8 and 9.

So what I've put in front of you is Claim 8 and 9.  Claim 8 says Claim 1 "wherein the valve is a mitre valve."  We talked about that before.  We're not limiting Claim 1 to a mitre valve.  Claim 8 then adds that additional specific structure

that it's a mitre valve, therefore there's no problem of claim differentiation.  Claim 9 says, "wherein the valve," that is wherein the valve of Claim 1, "is of a breakaway design to permit separation from the means for injecting."  So again, Claim 9 is adding that additional feature of a breakaway design.  So what we see there is because Claim 9 now adds that breakaway design, the breakaway design is not even in Claim 1.  Claim 9 adds that additional feature, and by adding that additional feature, again, it's not running afoul of claim differentiation.

I've cited on the bottom of this slide two cases:  The *Saffran* case and the *Nomos* case, which many other cases talk about claim differentiation, but that's why I cited that there.

Interesting that Claim 9 actually does suggest that that breakaway design is not even in Claim 1.  What we've heard multiple times, there's multiple -- I'm trying to quote -- variety of different types of valves in this patent.  But in reality what we have is one valve that has the opening and closing of leaflets, which -- and that one is for permitting inflation and sealing, and we have the breakaway valve, which is for securing and -- for securing the tubing and thereafter letting, with a tug, letting it get released, and yes, the combination of the two, which is what you see in Claim 9.  Claim 9 now adds that breakaway design.

Now, if you could put up slide 67, please.  Because for

the very first time in the reply brief they raised this other Samuels patent.  This is an older Samuels patent.  You don't have it in the record before you.  There's no exhibit.  The '851 patent is not -- it's not in the record.  It was raised for the first time in their reply brief, and was not part of their 4-3 disclosure.  I'm not sure why they didn't do that, but they didn't, and so I want to preserve our objection to this.  But even if you want me to address it, I will.  This is an older patent.  And what's interesting about that patent -- and I know you don't have it in front of you, you have to take my word for it -- it is not claiming a valve for thereafter sealing.  It only has one claim directed to the valve, and it's not claiming a valve for thereafter sealing to prevent deflation.  Again, that's what we're dealing with here.  We're dealing with a specific valve, and that's not what was being claimed in the other patent.

The other interesting thing about that other older patent is it was directed to simply -- and this is picking up on what you picked up op earlier -- it wasn't directed to a saline-based material; it was only a hardening-based material.  And finally, the reason that actually supports TriVascular's position is because the fact that they included that one paragraph in the older patent and chose not to include it in the Samuels '575 patent, the patent-in-suit here, tells us that it's because they didn't intend for that to apply to this

patent, and of course it couldn't, because the patent here is claiming a valve for thereafter sealing to prevent deflation. So that patent is either irrelevant or it supports TriVascular's position.

I could go on about that patent. The paragraph they cite cites to some other kind of valve. There's no disclosure. There's no figure about it. But I think you've heard enough of that.

**THE COURT:** Yeah, let's move on to some of the other terms. And I'd like you to tell me, in order of importance, what's the next one of importance?

And let me ask Mr. Petruzzi, because I'm not going to go through every single one of these, but what's the most significant? Obviously, this one was the most important.

**MR. PETRUZZI:** Well, I think -- I don't know if it's most important, but the means-for-claim element sort of ties in with that, and I think that might be worth talking a little bit about, because the arguments made were so starkly different between the two parts on this.

**THE COURT:** Well, all right. So the question being whether or not the valve is part of the means, part of the structure as opposed to just the syringe and the tubing?

**MR. COHEN:** That's right.

**MR. PETRUZZI:** Correct. Correct.

**MR. COHEN:** And that is -- that's a specific

means-plus-function analysis that it's pretty straight forward based on the case law that you have to look in the specification to see what that quote-unquote corresponding structure is disclosed in the specification for performing that function, because the means is this generic word that you're allowed to use under section 112, paragraph F now, used to be paragraph six.  It sort of is an easier way of claiming, but then you're limited to that specific embodiment in your patent for performing that function, and that's why what we do is we just go straight to the corresponding structure in the patent for performing that particular function.

     If you'd like, I could start right there.

     THE COURT:  Yeah.  Well, why don't you address the argument that 1D addresses the valve, 1C doesn't, so the issue of whether the valve is part of the structure or not it finds itself in another -- 1C instead of 1B finds itself in another element of the claim, so why should it be construed to be part of the structure here?

     MR. COHEN:  Right.  Well, I guess the problem with that -- I'll jump to slide 32, it's sort of jumping out of order, but I'll start by saying because it's means-plus-function, and what the cases tell us is it's a statutorily mandated construction.  We have to go -- putting aside claim differentiation, putting aside other things, we have to go to the specification for determining what structure

performs that function.

But answering your question specifically, it is perfectly appropriate for the valve to appear in two claim limitations. And there on slide 32 is where we're citing to the *Columbia Cablevision* case which --

THE COURT:  Well, I understand it's possible.  I understand it's possible you could have, you know, something perform multiple functions, et cetera, but doesn't it have some telling value that the thing you claim should be part of the function of 1B is already directly addressed in 1C?

MR. COHEN:  Well --

THE COURT:  That has some value, doesn't it?  Do I ignore that?

MR. COHEN:  It probably does have some value, but as you look at this case law, it's -- we don't start there.  What we do is we have to look and see what is the structure in the specification for performing that function, and we really don't have to go anywhere other than -- I'll jump right to slide 27.

This is, you know, when we do our means-plus-function analysis under all the cases, *Saffran* is one of them, and you have to look to the spec to see what structure performs the function of inflating.  If there is something in the specification or prosecution history that links or associates that structure to the function, then that is part of the corresponding structure.

Here, in the specification, this is what -- we have it. The cuff is inflated and deflated by means of a valve.  So right there we know that the corresponding structure has to include the valve.  We then -- it goes on by explaining how that valve is part of that inflation.  When inflation -- we've been through this.  When inflation tubing 61 is in an engaged configuration with valve 37, the mating end separates the leaflets so that the cuff may be inflated.

That is the language that we're relying on for that additional part of the corresponding structure.  We put that in our opposition brief.  Plaintiff did not respond to this language in their reply brief.

Of course we've been through the figures, which would be the next slide, which again shows the language in the specification says the cuff is inflated by means of a valve. The mating end 63 separates the leaflets so that the cuff may be inflated.  Therefore, that means, the corresponding structure has to include this valve of leaflets separated by this mating end with that inflation tubing, and that's on slide 28.

What they said in their brief, in plaintiff's reply brief, is they said that we didn't cite any evidence.  They just said that, look, there's no need for that valve with opposing leaflets for the function of inflating.  But that's not the point here.  The point is what does the specification teach us?

Because we have to do this statutorily mandated construction, and I'm on slide 29.

And I thought it was very informative to just briefly step through slide 30 here, which is a similar case.  It's *Nomos versus Brainlab*.  There was a means-plus-function claim.  It was a means -- and this is cited in our opposition brief, the *Nomos* case.  It was a means for generating at least one ultrasound image, okay.  So there was no dispute on what the function was.  Everybody knew it was generating at least one ultrasound image.  The dispute was what's the corresponding structure.  I'm on slide 30.

The plaintiff contended corresponding structure was just that ultrasound probe and nothing more.  Because they said, look, to generate that image all you need is the ultrasound probe.  The defendant said no, it's more than that.  It's not just the ultrasound probe, but it also is this fixation device that secures the probe to the treatment table.  And the plaintiff said, wait a minute, you don't need that mounting device or that fixation device which holds the probe to the table to generate the image.  Plaintiffs said you don't need that.

Well, the federal circuit and the district court, and the federal circuit affirmed the district court and went to the specification and said, look, the specification disclosed that the probe was mounted to the treatment table by a fixation

device in order to generate an ultrasound image.  Thus, the corresponding structure was not just the probe, but also the disclosed fixation device that secured the probe to the treatment table.

I thought that was sort of an informative case, simple, showing this means-plus-function analysis.

**THE COURT:**  What about the fact that dependent Claim 9 makes reference to the breakaway valve which is the further limitation there designed to permit separation from the means of injecting?

**MR. COHEN:**  Right.

**THE COURT:**  Doesn't that suggest that it's contemplated that the breakaway valve, assuming that that's what it's essentially referring to, is separate from the means of injecting, that there's some differentiation drawn.  I understand that in the specification they have this overlap and it said one thing, but if you look down at the claim language, dependent claim language, it seems to separate out the means of injecting.

**MR. COHEN:**  Well, let me address that claim differentiation looking at a different claim when interpreting that means-plus-function claim saying, well, wait a minute, how can that -- doesn't that tell us that somehow the valve is not part of the means-plus-function.

And I have slide 31 up, because this is precisely an issue

that comes up multiple times in these means-plus-function cases.  And, you know, the *Saffran* case again, a patentee cannot rely on claim differentiation to broaden the means-plus-function limitation beyond those structures specifically disclosed in the specification.  And I think the underlying purpose and the reason is because claim differentiation doctrine, the cases talk about, it's not a rule, it's a doctrine.  It cannot overcome statutorily mandated construction.

And what's -- and more interesting about this *Nomos* case -- and I'm on slide 31, this second long quote.  What I've actually done was quoted from the *Nomos* case:

(reading) The plaintiff cannot evade the limitations of the statute by asserting claim differentiation.

And I'm going to read, because we just went through *Nomos*, because *Nomos* had that same issue.  It had a Claim 3.  The plaintiff argued that quote:

(reading) Claim 1 should not be interpreted so as to include a fixation device because dependent Claim 3 claims a means for mounting.  This argument -- and this is still -- I'm still quoting from the federal circuit -- this argument, which relies on the concept of claim differentiation, is unavailing... Our interpretation of the corresponding structure comes from the written description, not from dependent Claim 3, and therefore the

prohibition against reading limitations from a dependent claim into an independent claim is not violated.

I hope that answers your question.

**THE COURT:**  All right.  Let me go ahead if you're about done.  I want the hear from the other side, please.

**MR. COHEN:**  Okay.  Earlier you asked about whether or not you could have valve in two places in the claim, and I have this slide 32 which points out the *Columbia Cablevision* case which cites back to sort of the original case on this concept, *In Re Kelly*, 1962 from CCPA.  And the bottom bullet there on this slide I say -- there's additional case law, you know, that cite to *In Re Kelly* that we did not include in our opposition brief.  I was being extra cautious, because they're not recorded.  One of them is a federal circuit case, and I didn't want to run afoul of the local rule saying you shouldn't be including an unreported case.  But I have the cites, if that's of help to you.

**THE COURT:**  Well, it sounds like you don't need it.

**MR. COHEN:**  Okay.  Thank you, Your Honor.

**THE COURT:**  Thank you.  Mr. Petruzzi.

**MR. PETRUZZI:**  I just have a couple comments.

I do agree, Your Honor, that the dependent claim issue is instructive, because it makes no sense to read Claims 9 and 19 where the means for injecting includes a valve and at the same time it can permit separation from the means for injecting, so

I think --

THE COURT:  What about the *Saffran* case, though, saying that given when you're in the means-plus-function area, the doctrine of claims differentiation has a different play?

MR. PETRUZZI:  Well, it does have a different play, and I don't think it's nonexistent.

In this case the means for inflating, we believe we've laid out in our brief, is quite clearly the inflation tubing, and the syringe.  If you want to go the route that the defendants have taken, you might very well have to include, as we said, some of the cuff, and you might have to include the channels, because all those things under their theory would be part of the inflation.  Without them it wouldn't inflate.  Whereas without the valve, it would inflate, without the mitre valve, Your Honor.

THE COURT:  But just from a common sense, if you didn't have that breakaway valve or the circumferential ring that prevents, like we talked about earlier, that during inflation, if you didn't have anything, you're just trying to insert it loosely, you wouldn't be able to inflate.  I mean, you'd get some partial inflation.  I would assume you'd get some leakage out of it.

MR. PETRUZZI:  Well, you would.  And I just don't think, though, just because it cooperates in conjunction with the active inflating means that it's part of the structure that

causes the inflation.  And again, it doesn't make sense, because, as you pointed out, you have two specific elements in the claim, one that's the injection means, and one which is the valve.  And I just don't believe that you can read the *means for* so broadly to include and require, as they require, a leaflet valve, because as we with pointed out earlier, the other valve does permit inflation and thereafter seals.  I mean, it clearly does.  It may not do it forever, but it certainly does it thereafter, and there's no question about that.

Now, defendants put in some invalidity contentions recently -- that date I have there is 9/10, it's actually 9/20 -- and when trying to validate the claim, they assert the structure was the syringe and the port.  Now, that's quite different than all the other added parts they're now talking about.  You can't have a different invalidity argument for your claims than you do for your claim construction.

**MR. COHEN:**  Your Honor, at this point I have to object to the use of that.

**MR. PETRUZZI:**  Can I just finish?  Because --

**THE COURT:**  Let him finish.

**MR. PETRUZZI:**  -- because one of the defendants is a current officer in the company.  These are invalidity contentions, and we didn't receive until shortly before the briefing started on this *Markman* process.  We only realized

this later. And it says what it says. I'm not changing what it says. This is a claim element. To invalidate it, they assert this is the structure. So it's the same argument. The structure and the claim, they say for invalidity, should be this, but in the litigation on the claims now they want to say it's something different. And, you know, it's just a point.

It just seems quite clear to me that not only does the means for inflating only include the tubing and syringe for all reasons we've argued, but even the defendants themselves believe it's limited to that structure, and that's why we cited it.

THE COURT: Let me ask you, there is a ground between your two extremes here, and that is depending on how you construe 1C, I mean, one could say that the means for injecting inflation material into the cuff to inflate it, in order to inflate it, you have to have something during the inflation process that prevents the fluid from leaking out, and so one could say that you need to have some kind of valve, circumferential ring or something that seals it like a breakaway valve. Maybe you don't need the leaflets and moving parts, but you need something. If you just had the syringe and the tube, it's hard to imagine how you could accomplish inflation. So there's an argument in the middle between these two positions.

MR. PETRUZZI: And there may be. I mean, you get into

the question, I guess, of the breakaway valve being present in order to permit the inflation in D, which also you're saying would be part of the means for inflating.  I mean, there's some overlap, no question.  But I think how this term would ordinarily be read is to separate the valve mechanism from what sends the fluid into the device.  Because, again, you could argue that you have to have channels, you have to have some kind of channel to receive the material, I guess, to inflate it.  I don't think anyone would include all of that.  So we think that it's more properly read just like the patent that shows it, which is the syringe and the tube that's inserted. Maybe there's a point --

THE COURT:  Well, but what I just posited is consistent with what they claim, and that is the specification in column four, lines 8 and 9, talks about the cuff is inflated, deflated by means of a valve, you know, there's that means language in there.  And also at column four, 17 through 20, inflation, when the inflation tube is engaged in configuration with a valve, it does seem to suggest that the valve has -- is part of the structure.

MR. PETRUZZI:  Oh, yeah, and it cooperates to get the overall device inflated, but so do other parts of the cuff as well, and the dependent claims make that a little bit of a hard read, because you have to be able to separate one from the other.  Understand that you can broadly read under 112 in some

context.  I know the *In Re Kelly* case, when you drill that down, it's really more akin to the kind of part where you had a drive shaft driving multiple pieces, and so it was one part being used for different elements in the claim.

Here, they called out the means for injecting and the valves, two separate claims, and specifically has described them as being separable from each other, so it just seemed that it was difficult to include the valve and the means for injecting as such.  Even if the breakaway type or seal valve might be an important thing to have, I just don't see that it's consistent with how the claims would be read if you could separate it from itself.

**THE COURT:**  Well, there is one interpretation that you don't like, and that is B:  Includes the breakaway valve or something like that that would prevent leakage during inflation necessary to accomplish the inflation along with the syringe and the tube.  But C is, if you read "thereafter sealing to prevent deflation," which seems like a discrete period of time after it's been inflated, suggests that you do have to then have some kind of a, like I say, backflow preventer, at least when you're using saline and not a hardening agent.  So there is a way to interpret this to involve the two different kinds of valves here.

**MR. PETRUZZI:**  Well, I do think that that seal valve does thereafter seal, and thereafter seals it to prevent

deflation.  It doesn't say that it thereafter has to seal it for the life of the patient.  It's talking about sealing it during the procedure, which is how these things are used.

So I think you could, even if you wanted to go with the defendants partially on the *means for* and include the breakaway or seal valve, you could still interpret element C to be still that kind of device that affects flow, which doesn't have to be narrowly described as a movable parts valve.  That's all.

THE COURT:  All right.  What would be -- if you had to choose one more issue to discuss today that is of importance, what would that be?

I mean, frankly the affixed -- the question about the affixed and the engaged, it seems to me that's less important. I think we all know what that means, and, frankly, I'm not sure that requires construction.

MR. PETRUZZI:  The only other term we would, I guess if we had to pick one, would be that Claim 1 has to have an inflatable chamber as such, which is how the defendants are interpreting one of the terms.  Let me see.

THE COURT:  Inflatable protrusions including at least one circumferential --

MR. COHEN:  How about term six and ten?

MR. PETRUZZI:  Six and ten, I think it is, yes.

MR. COHEN:  It's inflatable and deflatable cuff.

MR. PETRUZZI:  They say it requires an inflatable

chamber.  And our point is simply that Claims 14 and 23 specifically call out the inflatable chamber, Claim 1 does not. So in our view Claim 1, you don't read the cuff to require something that Claims 14 and 23 add explicitly.  They're all independent claims at the same level, so it just seems that a proper construction -- this is not an unknown term in the medical field.  There's a lot of cuffs that go around your arm for blood pressure.  It's a kind of rounded device and cylindrical kind of device, which is what the patent shows, and there's no requirement in Claim 1 that it have its own separable inflatable chamber.

We all agree that the device, and the *inter partes* established, that the patentable feature was the inflatable ridges, so there's no dispute, I think, on that term.  Both parties agree it has to have inflatable ridges.  And we don't think that --

THE COURT:  But the question is whether the chamber itself, the ridge itself be inflatable?

MR. PETRUZZI:  I think the question is whether the cuff in Claim 1 requires that there be a separate inflatable chamber apart from the inflatable ridges.  I know the embodiment of the patent shows that there is a -- there are spaces that are filled in addition to the inflatable ridge, but --

THE COURT:  Right.

**MR. PETRUZZI:** -- the device inflates even if you just had inflatable ridges inflated, because they pull up the old device together to create a stiff cylindrical lumen that could then pass through it.

So all we're saying is it's hard to interpret Claim 1 which has that language for element six and ten to include what is already claimed explicitly in Claims 14 and 23, I think it is.  So that would be it.

**THE COURT:**  All right.  So what's your response to that?

**MR. COHEN:**  I'm trying to step through this quickly, Your Honor.

It's in Claim 1, this term, "inflatable and deflatable cuff are generally hollow cylindrical continuation," it's actually a typo.  It means configuration there.

On slide 70 we have competing constructions, and slide 71 tries to start mapping the term "cuff."  What does that mean according to the spec?  You know, there's the cuff on my sleeve, and I guess people do sort of know what cuff is.  But here in the patent you have this cuff, which is shown there in the upper right in blue, and it has this inner surface of the cuff, and in order to inflate this cuff, you have to have this chamber in between.

And so the figure 2 is shown here in the patent in a cross-section, and you see the inner surface of the cuff there

is in yellow, the inflatable chamber there is in like orangish color labeled 23 in the patent -- I'm sorry -- inflatable chamber labeled 27 in the patent, and the outer surface is -- is shown there in blue as well.  So when we're talking about the cuff, we're talking about this band-like structure.

Now, the claim language itself, and that's where we're starting --

THE COURT:  A band-like structure, as distinguished from the ridges, is the essentially cylindrical --

MR. COHEN:  Inflatable ridges, right.

And so you see in that cross-section, you see the ridges are in this fluid communication with the inflatable chamber, and that is the chamber, the cavity between the inner and outer surface of the cuff.  And in order to get that cuff, that inflatable cuff, which is separate from inflatable ridges, you have to have that cavity, that chamber in there that is inflatable, according to this patent.  And so the claim language, which I have there on slide 71, tells us that the cuff has this inner surface, an inlet, an outlet, and this outer surface.  And because the language is "inflatable cuff," we'll see that it has to have this chamber.

So if we go to the specification, it talks -- it tells us this inflatable chamber 27 is what's between the inner surface and outer surface, and that's how when we're interpreting inflatable/deflatable cuff, it's this band-like structure that

has an inner surface and outer surface and this chamber in between, so it can be an inflatable cuff as opposed to just any old cuff that's not inflatable.  So in order for that cuff to be inflated, it must have that chamber between the inner and outer surfaces, and that's on slide 72, quoting from the specification.

Now, there's also file history statements that support that you have to have this chamber as part of the -- as part of the definition of inflatable cuff.  And here it's Exhibit 3, I'm on slide 73, where the plaintiff here said that "the inflating cuff is performed by injecting a material into the inflatable chamber defined between the inner surface and outer surface."  So it's that -- inflatable chamber is defined between the cuff's inner and outer surfaces.  Again, that's important.  If we're just talking about a cuff, we wouldn't be talking about necessarily having a chamber, but because it's an inflatable cuff, it has to have that chamber between the inner and outer surfaces.

Included on slide 74, more from the file history, which again tells us that this inflatable chamber is what sort of defines what the inflatable cuff is, that space between the inner surface and outer surface, that's on slide 74.

And so here, conclusion on this term, what we have is the inflatable/deflatable cuff is this band-like structure, trying to come up with what the intrinsic evidence tells us this cuff

is that has this inner surface and outer surface, and that's right from the claim language, creating this inflatable chamber that's inflated by filling the chamber with a fluid or deflated by allowing the fluid to leave the ordinary use.

Now, I talked about the band-like structure and inflatable chamber, but I didn't talk about the fluid, and that language comes from the term "inflatable," and that means to be filled with fluid, and we go through that in detail in the inflatable protrusions section of our brief and in these slides.  And that's, as you know, determined by the PTAB based on Samuels' arguments.  And I don't think there's any dispute on that, because in their opening brief and reply brief, they say that they agree with the PTAB's interpretation of "inflatable," that is to be filled with fluid.  But then they step back from that. When they actually propose their construction, they don't include that language, "filling the chamber with fluid" or "to be filled with fluid."  So that the inflatable/deflatable refers to inflated by being -- by filling the chamber with fluid, and we've included "or deflated by allowing the fluid to leave in ordinary use."

Any questions on that term?

**THE COURT:**  No.  What about the fact -- I mean, this is one of your arguments -- that in Claim 1A the cuff has an inner surface, an outlet, and a friction-enhancing outer surface, which of course includes at least one ridge.  But the

friction-enhancing outer surface, it seems to me, unless you inflate the cuff itself, it seems to me you get less value out of a friction-enhancing outer surface unless it's pressing against the tubular wall.

MR. COHEN:  That is what's disclosed in the patent, yes.

THE COURT:  So if you're only relying on the ridges, basically, to inflate the cuff --

MR. COHEN:  Well, the ridges are actually what affixes it which holds it in place, but for it to be -- so you've got inflatable protrusions separate from inflatable cuff.  The cuff itself is inflatable because it has that chamber.

THE COURT:  No, no, I understand, but the contrary interpretation would be that the cuff doesn't necessarily have to be inflatable itself.  So in order to have an inflatable cuff, it really depends on inflating the ridges; right?

MR. COHEN:  Inflating the ridges and the chamber.

So you could just have a cuff, okay.  This claims an inflatable cuff, but you could just have a cuff with inflatable ridges.  But that's not what you have here.  We have an inflatable cuff *and* inflatable ridges.

THE COURT:  No, I understand that.  I guess I'm trying --

MR. COHEN:  In the claim, in the claim it's actually calling it 1A, an inflatable and deflatable cuff, and that's

why we actually -- you have this chamber, because that chamber is what defines the inflatable cuff, because you've got the inner surface, the outer surface.

THE COURT:  All right.  Then I should address my question, actually, to Mr. Petruzzi.

MR. COHEN:  Did I address your question?

THE COURT:  Yes.

MR. COHEN:  Thank you.

THE COURT:  So without having an inflatable chamber 27, which you're saying is not essential to this embodiment, how would you have an inflatable -- what inflates the cuff?

MR. PETRUZZI:  Well, even by their own slide 73, it talks about transforming it from a deflated state to an inflated state by introducing fluid in both the inflatable chamber and each of the circumferential ridges.  That is the specification disclosure.  You can inflate this device just by inflating the ridges that are interconnected to each other.

THE COURT:  Okay.  So that's what I was asking.  If you just did that, and so you have all these inflated now fairly solid circumferential rings around the thing --

MR. PETRUZZI:  Yes.

THE COURT:  But the cuff itself, since it's not inflated, it's just material, it doesn't bulge out or it doesn't extrude or it's not convexed in any way.  It just sort of sits there in between the ridges; right?

**MR. PETRUZZI:**  It could, yes.

**THE COURT:**  In that case, what value is the friction-enhancing outer surface of the cuff?  I thought that was intended to add additional friction in addition to the ridges, which I understand the main thing that keeps it in place.

**MR. PETRUZZI:**  No.  The PTAB and *inter partes* established that the inflatable protrusions are the means or what I'll call are the ones that cause friction-enhancing benefit.  That is the friction enhancement in this case, it's the inflatable ridges.

There was other disclosures in the patent about other things you could put on the outer surface --

**THE COURT:**  Right.

**MR. PETRUZZI:**  -- bumps and things.

**THE COURT:**  Right.

**MR. PETRUZZI:**  But it wasn't required for --

**THE COURT:**  Figure 3.

**MR. PETRUZZI:**  Well, it could be figure 3, but at a minimum it required the inflatable protrusions, and they themselves are friction-enhancing.

**THE COURT:**  No, I understand that, that's the main friction-enhancing, that's the main device that keeps it in place and prevents longitudinal movement, et cetera, et cetera.

**MR. PETRUZZI:**  And *and* there is, as disclosed in the

patent, with the use of Teflon or otherwise, this device, you know, after -- over a long time, it ingrows into the aortic vessel itself.  So all of that that you see that is kind of like my second video that showed the occlusion, it's not just the ridges that will ultimately be touching the blood vessel, this whole device will be kind of grown around on the outer periphery in the vessel.  But you don't need that all of that cuff, as they're trying to show, has to have this long extended inflatable chamber.

You just have to really have -- if there is a way to get fluid to these circumferential ridges, which are inflatable, and which, as they point out in their slide, is one of the ways that it is inflated, it's inflated by inflating those ridges as you can see.  As you inflate it, the fluid will fill up each ridge and causes the thing to become a turgid cylinder, and then only thereafter is the valve prevented from inflating, because at that point the material is pushing back all the way to the valve point, and that's why we think the valve --

THE COURT:  I'm just sort of curious.  Other than the embodiment that is shown here on this slide in which there is a chamber in the cuff that is in fluid communication with the ridge, how would you practically inflate those four or five ridges in isolation if they weren't -- the easiest way to do it is to have all of them --

MR. PETRUZZI:  You would fill the channel.  There

would be a channel, and you would go to the first ring, another channel, second ring, another channel.

THE COURT:  It's a separate channel for each ring?

MR. PETRUZZI:  Yeah.  If you wanted to -- no, not a separate channel, they're all interconnected.  There's a channel from the port that goes up to the first tubing, the first circumferential tube, and then on one part of that circumference, it feeds another short channel that goes into the next --

THE COURT:  Oh.

MR. PETRUZZI:  See.  And that's how they build them, so that when you fill it up, it fills up each ring one after the other.  As you saw the video, it shows how each ring fills up sequentially.

THE COURT:  Is there anything in the description, the specifications that demonstrates that modality of inflating the ridges?

MR. PETRUZZI:  Well, it's just that they're in fluid communication with the fill port.  It doesn't really matter that -- if you look at slide 72, which I guess maybe up on the ELMO, you know it's sort of a topological question, I guess, as to how much of it has to be there to create the fluid communications.  Clearly, the patent describes --

THE COURT:  Well, but figure 2 --

MR. PETRUZZI:  If you look at figure 9C, it shows

exactly what I'm describing as the interconnection 125 from various rings so they can fill each set of rings.  So there's clearly disclosure to the concept --

THE COURT:  I thought that's connecting different stents.

MR. PETRUZZI:  Sure.  But I'm saying the disclosure question was is there disclosure about filling a tube with that kind of additional channel, and there is.  And it's, again --

THE COURT:  Well, but within a single stent is there -- other than figure 2, which shows what you would think is a more obvious form of fluid communication when you fill everything up, including the chamber as well as the ridge, which is part of that, is there anything that suggests, either in the description or written description or the figures that shows, instead of fluid communication with the chamber of the cuff, that each ridge is its own little chamber and it's connected to the next ridge by a line?

MR. PETRUZZI:  Well, again, I don't see really the difference, because there's a fluid communication path that fills up each ring.  Whether it goes entirely around the cuff or is partially around the cuff, it's a channel that fills those ridges, so I just don't think it requires -- if what they're asking for is that all of the cuff itself have two sides in which there's fluid filling all of it, I just don't think that's required, certainly not by Claim 1, and even in

Claim 14 it just calls for an inflatable chamber, and you could have an inflatable chamber between the inner and outer surface that then is in fluid communication with the rings, and that's all it would be.  It wouldn't necessarily be the entire circumference of the cuff.  I just don't think that's required. Even though the spec may show that as a preferred embodiment, the claim language just doesn't support it, but just talks about there being an inflatable cuff, yes, and inflatable protrusions, and by inflatable protrusions you get inflatable cuff, Claim 1.  Claim 14 does require there be some kind of additional and inflatable chamber.  But, again, I don't think just because the spec shows it in one embodiment that it's the inner and outer surface of the entire embodiment that it necessarily has to be that.

Again, this entire argument, you know, has been based on reading the spec into the claims, and in this case it just requires at least one protrusion.  So you could have a port filling in, you know, just right on the edge of the cuff and one protrusion, and that will be enough to be this stent, this device.  You don't have to have a whole series of these protrusions.  I think that the --

**THE COURT:**  Well, that's interesting.  If you only had one protrusion, one ring, how does that perform the function of preventing an aneurysm, for instance?

**MR. PETRUZZI:**  Well, of course what prevents the

aneurysm is not this part of it, it's the bypass tubes we show that are fixed within that device.  So the aneurysm is something you're trying to bypass.  And all this really is doing in this particular embodiment -- this device is described in a lot of other ways, not just in this aneurysm context. This is essentially a point at the very top of the aneurysm to create some kind of fixed, semi-fixed, somewhat affixed, however you want to characterize it, we talked about that, starting point.  From there you can pull off the iliac legs, as we've shown in the video, and that bypasses the aneurysm.  It's not this device that you put on the aneurysm.  This doesn't pressure the aneurysm.  Where you put it, at least in the embodiment we showed -- again, this is one embodiment -- is at the healthy part of the aorta above the aneurysm, that's where you put the pressure.

THE COURT:  Well, it just serves as an anchor for the other stents that you're going to put in?

MR. PETRUZZI:  It serves as a -- in a sense kind of an anchor from which you can draw an additional tube if you want. You don't have to.

In the aneurysm setting that we've shown, that is the case, but there's other ways of using this.  It's only -- this device is broadly just an interluminal stent.  It can be used temporarily.  It doesn't have to be left in the body.  It could be used in other kinds of -- you know, like I showed the

inclusion environment where you put it to broaden an area that's getting narrow, so you put it there.  It's not anchoring anything, it's just sitting to then create a flow path.

THE COURT:  Okay.  So it's like a regular stent.  You deal with the occlusion by widening the radius or diameter of the opening.

MR. PETRUZZI:  Correct.

THE COURT:  And how could you do that if you -- with one ring and no chamber inflating the cuff?

MR. PETRUZZI:  Well, it depends, I guess, on how big the ring is and configuration of the --

THE COURT:  You're relying on the ring in and of itself to deal with the occlusion.

MR. PETRUZZI:  You might.  I mean, this is not necessarily designed to only be an occlusion device or an aneurysm device, it is simply an inflatable stent, an interluminal stent.  It's a tube that's inflatable and has these ridges, and the ridges cause it to affix, I mean, in the terms that we've talked about.

THE COURT:  But if you had an inflatable chamber, as called out in Claim 14, I guess, that would have some functional value; right?  I mean, you could use it to ensure flow through an occlusion.

MR. PETRUZZI:  It could presumably help to make a longer more rigid device.  But the claim language just calls

for at least one inflatable protrusion, and that inflatable protrusion can inflate the cuff.  And, again, I don't think it's required in Claim 1 that the cuff itself have this inner and outer surface that is itself inflatable.

THE COURT:  All right.  What's your comment on that?

MR. COHEN:  Your Honor, I think you've actually put your finger right on the point.  We were just talking about Claim 14, so let me jump to that.

Claim 14 actually uses the term "inflatable chamber," because you'll see when it defines at 14A, it just says "a cuff;" right?  So it has to then explain that it has to have this inflatable chamber.

In Claim 1, it doesn't use the term "inflatable chamber," but instead it uses "inflatable cuff," and that inflatable cuff is defined by having an inner surface and outer surface, and that chamber.

And so getting back to your earlier question, is there any other -- any disclosure in this patent of anything other than what's in figure 2?  The answer is no.  There's always the inflatable chamber -- I'm sorry -- the inflatable cuff has this chamber, and the inflatable protrusions also are separate and have the inflatable protrusion.  So that's why you'll see in Claim 14 -- actually, if you could go to claim 23, it also uses that term "inflatable chamber," because it doesn't say inflatable cuff at the beginning of the claim.  Later on in the

claim it refers to inflatable cuff, because that inflatable cuff is defined by that chamber between inner and outer surfaces, as shown in figure 2.

THE COURT:  So which way does that cut?  I mean, if Claim 1 could have but did not say a cuff with an inflatable chamber, it simply said "inflatable cuff..."

MR. COHEN:  That's why -- that's why you have to have the inflatable chamber, because it uses the term "inflatable cuff."  In the other claims it just says "cuff with inflatable chamber."  So what we're interpreting is "inflatable cuff."  So what does that got?  It's got this band-like structure, and it has an inner surface and outer surface, but it has to have this chamber to make it inflatable.

If Claim 1, for example, was just a -- let's just call it an expandable cuff.  All right.  If it was an expandable cuff, then we wouldn't be talking about this inflatable chamber existing; right?  But the claim is an inflatable cuff, and that inflatable cuff is defined by -- when we're interpreting what that means, we're talking about it having this inner surface/outer surface, and the chamber, and that's -- you know, supported by Claims 14 and 23, and that is the only embodiment.

THE COURT:  Well, what's the difference then between the cuff, as described in Claim 1, compared to Claim 14?  You're saying there the same, essentially --

MR. COHEN:  Well, there's other limitations which are

different.  But as I'm sure you're well aware, when people are drafting patents, they use different words many times to describe some of the same things.  Claim 14 chose to use just "a cuff," and then include the "inflatable and deflatable chamber."  Claim 1 chose to use the language "inflatable/deflatable cuff."

If we can go to, I mean, I guess slide 38, this is really dealing more with the protrusion, so I don't -- you know, this is showing figure 2, but it's -- when the term "inflatable" is used, we're talking about it contains fluid itself, so this -- how does the cuff contain fluid itself if it doesn't have that chamber?  Now, if we don't want to use the word "chamber," fine, but it's got to have that cavity that is inflatable for it to be an inflatable cuff.

Did that answer your question?

THE COURT:  Well, I guess -- I mean, maybe I'm asking it differently.  Is there a claim differentiation, and, quote, type issue here when you compare 1 and 14, why are they described differently?  I'm troubled by that.

MR. COHEN:  Well, I guess because they wanted to make sure that they were capturing an inflatable cuff; right?  It's not just "a cuff."  So in Claim 1 it's an inflatable cuff, in Claim 14 they're claiming it is a cuff with an inflatable chamber.

THE COURT:  Is there a way to have an inflatable cuff

other than as described in Claim 14 with an inflatable chamber?

**MR. COHEN:**  I don't think so, because if you -- if you are interpreting Claim 1 without the inflatable chamber, then you would really be saying it's -- you'd be saying that is an expandable cuff.  But because they use the word "inflatable cuff," we have to inflate the cuff, and that's not just inflating protrusions, that's separate.  To inflate the cuff, we have to inflate the cuff, and the cuff, of course, has got the inner surface and outer surface; how do you inflate it but inflating the area between the inner and outer surface.

**THE COURT:**  All right.  Mr. Petruzzi, I'll give you the last word on this.

**MR. PETRUZZI:**  I was just saying Claim 1, element A, is one element, and the protrusions are part of that cuff, it's not separable like the way Mr. Cohen is saying.  And clearly you could have a series of inflatable ridges that are interconnected to each other, as taught by the patent, and if that inflated, anybody would say that's an inflatable cuff.  It doesn't require that the inner and outer surface have a channel between them for the inflation material, so --

**THE COURT:**  All right.  I will take the matter under submission.  The arguments have been helpful, and I appreciate your presentations, and I will get out a claim construction as quickly as possible.

When is the next --

THE CLERK:  We don't have a date.

THE COURT:  We don't have a date for the next event here.  Why don't we set a control date?

MR. COHEN:  What you said last time is you would set it after the claim construction order came out.

MR. PETRUZZI:  That sounds right.

THE COURT:  Well, why don't we set a status.  I like to always have some kind of date to control myself, so let's set a status date maybe five weeks out.  You know, it may not take that long, but if I have to move it, we'll move it.  But let's make sure we --

THE CLERK:  December 10th at 10:30, counsel.

MR. COHEN:  Thank you, Your Honor.

THE COURT:  All right.  Thank you.  I appreciate it.

(Proceedings adjourned at 12:01 p.m.)

---oOo---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    Monday, December 14, 2015

_____

Rhonda L. Aquilina, CSR No. 9956, RMR, CRR
Official Court Reporter